May it please the Court, Kurt Hermanson on behalf of Mr. Murillo-Betancourt. Your Honors, in this case, the Court should reverse the District Court because Mr. Murillo-Betancourt was under official restraint. There was border patrol to the right of him, border patrol to the left of him, border patrol in front of him, border patrol on top of him. He was in the clutches of the border patrol and could not become free to mix within the general population. Are you asking us to extend the rule that exists in this circuit already, or do you think the rule that we have covers your situation? I'm not asking the Court to extend the official restraint doctrine because it's not necessary in this case. The Ninth Circuit has made many fine distinctions in this area of the law, sometimes finding there's official restraint, sometimes finding there's not, based on very fine distinctions. But the ultimate question is whether or not the person is free to mix within the general population. And in this case, the government did not prove that Mr. Murillo-Betancourt was free from official restraint because we had Agent Rangel, who there was a seismic sensor alert, and he responded to that alert. He also indicated through his testimony in the short bench trial that he responded to the alert and that the alert went out on the radio to everyone in his team. The alert went out after the defendant had entered the country? When someone, well, we don't know. He was found very near the seismic sensor, so one could presume that the sensor alerted. So what difference does it make what happened after he was already here? Well, the issue is that the government has the burden of showing lack of official restraint, and in this case, not only was there a seismic sensor alert, but Agent Rangel testified about how there was a night scope operator, and in a previous Ninth Circuit case from that we know that they can see three miles. It was nighttime. They can see infrared with the night scope operators. They can see body heat. And he testified that they could see the area where Mr. Murillo-Betancourt was less than 200 yards. But there's no evidence that anybody did. To the contrary, what do you do with a Vela Robles case that says detection by a seismic sensor does not amount to observation or surveillance for the purpose of showing official restraint? Right. Vela Robles, that's one of the fine distinctions that the court makes in saying that it should be visual observation. But we have much more than a seismic sensor in this case. Where's your visual observation? We have Agent Rangel coming up on to the location with his headlights illuminating Mr. Murillo-Betancourt. He sees Mr. Murillo-Betancourt as he- Was he under constant observation as he crossed the border and entered the country? That's an we don't know if he was or not because- There's no evidence that he was. There is evidence that his movements were controlled and that he was completely surrounded by border patrol. And the problem- The first issue is that the government has the burden of showing lack of official restraint. The second problem in this case, which distinguishes it from Vela Robles, is that the district court in this bench trial would not allow me to ask questions of the one precipient witness who was out there in the field, the one person that the government called. The government chose to bring one person. It wasn't until trial that we found out that there was a night scope operator who could see Mr. Murillo-Betancourt and may have seen him come over the fence. What was the evidence about the night scope operator and in which direction the night scope was pointed? The evidence was that the night scope operator was right behind or north of Agent Rangel. That's an excerpt of record, page 26, line 19. So from that- Can you talk about in which direction the scope was pointed? The government didn't present any evidence of which way the scope was operated, but there is testimony from Agent Rangel that the night scope operators have monitors and they could see people where Mr. Murillo-Betancourt was. And there's also testimony from Agent Rangel that from where he was, he's on a hill, there's the one solid metal fence, and then they're on a hill. They can be seen from Mexico. People in Mexico can see the agent. The agent can see people in Mexico. And he testified that from where he arrested Mr. Betancourt, the night scope operator could see him. Whether they were looking at him isn't in the record. But again, the district court question after question after question would not allow me to ask questions to show control and found they were all irrelevant. And I believe was confused about the official restraint doctrine and didn't think it applied in a founding case and said so on the record. Twice when I tried to ask about the secondary fence, the district court sustained objections on relevance and found that that part of control, which was funneling Mr. Murillo-Betancourt right to the night scope operator and the bright lights, were all irrelevant. When I tried to ask Agent Rangel if it's easier to catch someone near the border fence than when they mix in the population, that relevance objection was sustained. When I tried to ask about other people who were working in sector, objections sustained. I tried to ask if there were other agents out there on foot. We were able to determine through my questioning that there was an agent to the east, an agent to the west. Is there any reason why all of this was not done in discovery? This is typical. The government will only give. That's the reason. It's typical. It's typical that the government does not produce this in discovery. Did you ask for it in discovery? Yes. I made a General Brady request, and any evidence of a night scope operator should have been given but wasn't. What's typical is we get the report of the arresting officer only, and that's all we're given, and that was the only. So the government has the burden of showing that. The General Brady request is pretty broad, especially if they don't have anybody who actually saw him. If you're looking for witnesses of the kind that you're now talking about, it would seem that you'd request that information before trial. I did file a discovery motion in this case, and the general discovery motion that was filed, I believe, should have resulted in discovery of the agents that were out there. It wasn't like it was a surprise. This was a short bench trial. The government knew from their own reports that he was arrested around actually less than 200 yards north of the border, that there was a seismic sensor alert, and so they knew that they would have to show a lack of official restraint, and they failed to do so in this case. And I did try to ask, most importantly, I tried to ask and was precluded whether the night scope operator agents  they would have been able to apprehend Mr. and Maria Bettencourt, and the court wouldn't let me get into that questioning. With all due respect, it seems to me that the court was not letting you do this because those are precisely the kinds of matters that ought to be gone into on pinpoint discovery before the trial starts. The whole thing sounded very much to me like a discovery proceeding rather than a trial. I agree, and I think the government should have given me the night scope operator. I didn't know until trial that the night scope operator was directly north of his position because Agent Runghill did not note that in his report. I don't know if it's a relevant question. I don't know that you lose your right to an answer to a relevant question because you didn't discover it in discovery. I wish the government had given me a report of who was out there. It might have been nice if they had asked the questions, but does that mean that if the question is relevant you don't get to ask it because you haven't engaged in discovery? No, I think on cross-examination of a witness or direct of a government witness, the defense has a complete right to present a defense, and that's what I was trying to do, was show that the government had not shown lack of official restraint, and time and again the court found that that was not relevant. Let me ask you this, Carl. We just had a case, as you know, about burden of proof. You say the government has a burden of proof of showing in every case that the person wasn't under official restraint? They do. No matter what, it takes nothing to shift that burden. It's just an automatic burden that as long as you say, they have to bring in evidence to prove that he wasn't? They do, but this court has said that it can be inferred if the person is, for example, in Los Angeles. It can be inferred, and the government doesn't have to present any evidence of official restraint. But when it's near the border, it cannot be inferred that the person entered free from official restraint, especially in this area right near the San Ysidro Port of Entry with all the lights and seismic sensors, numerous agents, all these means of control. What does it take to carry that burden? If a government witness comes in and says, he was not under official restraint, does that carry it? The government must prove beyond a reasonable doubt lack of official restraint. And as I said, there are a number of cases, and there are very fine distinctions. I think this court's opinion, and a recent opinion in Zavala Mendez, shows that continuous surveillance isn't the only way for the government to control someone. Because the ultimate question is whether or not you're in their clutches, or whether or not you're free to go within the population. And in Zavala Mendez, this court found that there was official restraint, even though the person was not under constant surveillance. Someone driving from Alaska, from Canada into Alaska, they had lost sight of that person. And in Pacheco Medina, they had lost sight of the defendant. Did they ever have sight of your client? I don't know if they saw him come over the fence. The government didn't present evidence about that part, and I tried to delve into the control. If you were right, that the burden is on the government, and you're saying they didn't have anyone testify that they didn't see him cross the border? Well, the open question is whether or not the NISCOP operators saw him. No, but the question is, did anyone testify for the government that they didn't see him? No. No one from the government testified that he wasn't seen. And I think it's logical, especially in this area, to infer that someone, they're called line watch. Well, I'm asking that question only because of your burden of proof argument. And I'm assuming for the moment that you're correct. If you are correct, then it's the government's burden of proof. And I ask this because of the quote that you have from Castellanos Garcia, where it says, in this case there was sufficient evidence of that lack of official restraint because the Border Patrol agent testified that he did not see the defendant cross the border, and there was no evidence to the contrary. What I was wondering is whether you are saying that the government has the burden of putting on a witness who says he did not see him cross the border. There's no doubt in my mind that the government has the burden. What happened in Castellanos Garcia was the court found that there wasn't a scintilla of evidence that he was under official restraint. Because in that case, although there was a- You don't need a scintilla of evidence if the burden is on the government and they don't introduce any evidence that they didn't, then they haven't carried that burden. It sounds like an odd concept. I mean, I must say I find the whole concept of official restraint an odd concept. It is odd, and it's because in the immigration context, this country decided that we wanted to put people in exclusion proceedings instead of deportation proceedings. It's much easier to just exclude someone. If they come into the country, they get due process and an immigration proceeding. They get a deportation proceeding. But if they haven't entered, as the word entry is defined in immigration, then they don't get a deportation proceeding. Does that mean then they're not subject to the criminal prosecution? Right. That term, the definition of entry is exactly the same for 1326 as it was for all the immigration cases. So this has a long history from 1908 to the present. So the result of finding that he was under official restraint is that they don't have to deport him. They can exclude him. Correct. But they also can't prosecute. He can be prosecuted for attempt. And in this case, the government easily could have charged Mr. Maria Bancourt with attempted entry. I see. Instead, they chose to charge him with found in. And it is a legal fiction that you cannot be found in. Even though you're physically present in the United States, you're not found here because you haven't entered if you're not free from official restraint. So if they're watching you or, as in this case, if you're within the government's clutches, border patrol to the right, border patrol to the left, border patrol in front of him, border patrol quickly responding to the seismic sensor, he had no possibility of entering the United States. And that most fundamental question, where I tried to ask whether or not the NITESCOPE operators could have apprehended him, objection sustained. And the government should have asked that question and brought the NITESCOPE operator to say, no, I couldn't see him or I didn't see him or I wasn't looking there. But what's logical is to presume that he was looking at the border. That's what we're protecting is the border to keep people from coming in. It's not logical to infer that he was looking anywhere else other than the border. They're called line watch officers because they watch the line. That's their job. And what is the case that says the burden is on the government? Every case, Your Honor. Pacheco Medina, Hernandez Herrera. I can certainly do a 28J with the street. All right. Thank you, counsel. Thank you. Thank you. Thank you, Your Honors. May it please the Court, Mark Rady for the United States. Do you agree the burden is on the government to show an absence of official restraint? I do, Your Honor. And was there evidence that nobody saw him across the border? Absolutely, Your Honor. I will say this. Officer Rangel, I reviewed the record again last night. He never said in as many words, and he was never asked, did you actually see the defendant cross the border? But that is the only reasonable inference from the evidence that was adduced. Officer Rangel testified that he was on duty in Whiskey 9 when he received a call from dispatch that a seismic sensor had been triggered in a location not in his immediate vicinity. He had to get in his vehicle and respond. He first made contact with the defendant at a point that was 200 yards north of the border. On that view of the evidence, the only possible inference is that the defendant crossed without Officer Rangel being seen. Now, we contend here that we did satisfy our burden of proof. Officer Rangel was the only arresting officer in this case. He testified that when he works line watch duty. Well, that doesn't tell us whether there are cameras on the border that show everybody crossed. No, absolutely, Your Honor. I tell you, this case really comes down to the facts. And every single factual concern that defense counsel just raised in his first presentation is actually met in the record. Your Honor asks about cameras. This Officer Rangel testified, excerpt of record, page 27, but in that area there was no cameras. We know there were no cameras at Whiskey 9. There were Whiskey 8 or 10 maybe, but not 9. If even that, Your Honor, I look to the next question because the question that the defense claims it wasn't able to ask about was preceded by a question about cameras at the San Ysidro Port of Entry, which was three miles to the west. That has nothing to do with the immediate environment where this defendant came through. I see that record as saying, are you familiar with San Ysidro Port of Entry? Yes. Are there cameras there? Objection. Sustained. I believe in this case the trial prosecutor did an excellent job of making sure that irrelevant evidence didn't get into the record. I don't know any case of this court that has said that the presence of cameras at a point three miles away has anything to do with the official restraint of a defendant where he actually enters. That was one of the things that the defense talks about that they weren't able to ask questions. What's another one? A second border fence that was located, again, northeast of where this defendant was arrested. This court's cases in a nutshell can be, I think, summarized in the concept if a defendant is not actually seen crossing the border, he's entered with sufficient freedom from official restraint. Now, I know that the defense, they tried to inject sort of this constructive restraint test. Well, was the defendant actually able to go in and mix with the population? I see that language every now in the cases, but this court, I believe, has repudiated that test. There's a case, United States v. Martin Placentian. We cite it in our brief. It's 532 F. 2nd, 1316. Did I descend in that case? Did you just ask about it? No. Did I descend in that case? No. No, you didn't, Your Honor. I don't believe, no, you weren't. We're not even sitting on that panel. The answer is probably. I remember the case about mixing the general population, a couple of them. I thought that was the test. Well, again, I have two responses. One, if that was the test, then all of our Imperial County cases where people are found in the most godforsaken areas where there's just sand. You don't have to actually mix. The question is, are you free? Could you go mix in the population? Well, okay, but then if I could, I'd like to read this quote. Martin Placentian. This was a case that's from 1976. This defendant in that case was at the San Ysidro Port of Entry. He made it through two fences, and he was about to scale a wall and make it into the streets of San Ysidro. In this court, in finding freedom from official restraints, said the appellant, while nominally within the confines of the Port of Entry, was at no instant up until the moment of his arrest under any type of official restraint, but to the contrary was exercising his free will, youthful enterprise, and physical agility, and evading fixed physical barriers in accomplishing his entry. The next sentence is key. Whether or not he was ultimately able to run the obstacle course and reach the streets of San Ysidro is beside the point. Now, having a chance of being able to mix with the population is the test. That holding right there is squarely inconsistent. Martin Placentia, it's been around for 20 odd years, hasn't yet to be criticized. After that case, in a number of cases, we've talked about being able to mix with the general population after Martin Placentia. Be that as it may, Your Honor, I mean, this case is also repeatedly cited, or this court has often cited Martin Placentia, is yet to be limited, yet to be criticized. But coming back to the sufficiency thing here, if the real question is what's this defendant seen, the government introduces the evidence of the only agent who arrested this defendant. This agent specifically testified that he did not, you know, he normally acts alone when he is on line watch duty. That's in Excerpt of Record 25. He also testified that he did not rely on the night scope operator. Now, there was a lot of testimony about the night scope operator, and I know Judge Trott asked, was there any evidence in the record where it was pointed? Defense counsel represented to you that there wasn't. I would say to the contrary, Your Honor. Officer Rangel testified, and defense counsel acknowledged this, that the scope operator was located on Whiskey Nine Hilltop behind his position. That's Excerpt of Record 26. Officer Rangel then two times, twice testified that the scope was directed at the Tijuana River Valley. And that's again at Excerpt of Record 26. It's a short quote, right behind me is a lead officer's scope truck looking over the Tijuana River Valley. That's pointed in the other direction. That's our point, because in another part of the record, Excerpt of Record 20, Officer Rangel testified that the Tijuana River Valley is below to the north of Whiskey Nine. Now, defense wants to make a point, well, look, it's the border. The only logical explanation is that the scope must have been pointed at the border. That's not necessarily true. It's not supported by the record, and it also makes sense. I mean, if the agents, if they're all looking at this, the line where the border is, there has to be somebody who looks to see the ones who make it through. And, you know, they also testified that once people get down into the Tijuana River Valley, it is often hard to see them. That's why it would make sense for an infrared scope operator, then, to be a second line of defense. But we can make all the speculation we want about what the policy rationale, whether it's a good idea to be pointed in one direction or the other. The fact of the matter is, this record, Excerpt of Record 26, specifically says the scope truck, here is the question, the scope truck is set up to watch the valley below and look for it. It has thermal scopes. Answer, yes, sir. And, again, also at that same page, Officer Rangel testified, right behind me is the lead officer's scope truck looking over the Tijuana River Valley. So the scope operator provides no basis to disturb the Court's finding that there was sufficient evidence to support the conviction. And there were no claims. When one looks to the second claim on appeal as far as what questions was the defense precluded from asking, and that's at page 33 of the opening brief, there's never any complaint about questions that the defense wasn't able to ask about the scope operator. The complaints were about I wasn't able to ask about this second fence to the northeast and whether it was constructed of concrete. Again, we would say that that other fence northeast is not relevant to the issue of the surroundings where this defendant came through. But we would also point out that, actually, at Excerpt of Record 19, the district court did allow a question, but just east of Whiskey 9, there are two fences. Answer, yes, sir. So that fact was in the record. Defense complains that they weren't able to ask who was working at dispatch that day. Well, at Excerpt of Record 29, dispatch is located in Chula Vista. That's miles from the border. And there was no evidence that the people in dispatch had cameras to be able to see what was going on in this area because, as I pointed out at the beginning of my presentation, the testimony was that there were no cameras in this area. So to be precluded from asking about sector dispatch, again, that's irrelevant to the issues here. And finally, the defense complains that they weren't able to ask about other agents in the area. Again, I would say that's not true. When one looks at the Excerpt of Record pages, again, I believe it's 26, Officer Rangel, in the beginning, defense counsel said something to the effect, who else was working that night? Objection sustained. But then the district court immediately revisited its ruling and said, you know what, you can ask them who else was working that night. And there was a question. And Officer Rangel testified, there was a patrol Whiskey 8 to my east, and to my west, there was one at Whiskey 10. And then there were no other follow-up questions. So I don't understand what it was that the defense was not able to ask about the other officers on foot. And the defense counsel also pointed out that he wasn't able to ask about, what about the people to the north of the defendant, who was working there? That objection was sustained. But again, those are the officers who are already down in the Tijuana River Valley. By the defendant's own question, that's after the point where he was arrested. How that could be related to whether or not he was seen crossing the border, which again, this Court has said, that is the key to official restraint. Are you in the constant visual surveillance to be able to not be able to ask about officers who are situated past the point of arrest? Again, I think the trial prosecutor did a good job of precluding that evidence because it's not relevant. And I think finally, Your Honor, you know, there was some mention about discovery. Look, I wasn't the trial prosecutor below. But you've seen the briefs. There's no claim in those briefs that we were improperly denied discovery. So I don't think anything that's outside the record should affect this Court's decision. Thank you, counsel. We'll give you a minute if you need the question. I can be very brief, Your Honor. I did want to correct one thing, one misconception that if the Court will continue reading the excerpt of record, it's my question to the night scope operator about where it looks. And yes, these night scopes can see three miles. There's a night circuit case that says that they can see three miles. Can they see the 2-1 in River Valley? Yes. But page 27, including that hill below where you found Mr. Mario Betancourt, objection, speculation. Speculation, because I asked you earlier what direction it was pointed in. You said there was no information on that. But it clearly says the scope truck is set up to watch the valley below. Right. That's one thing that it can do. Well, and you wanted speculation. Could it see this way? But it wasn't. That's why it's irrelevant. I respectfully disagree, Your Honor. The scope truck is set up to watch the valley below and look for, interrupted with, yes, sir, it has thermal scopes. So that's one thing it looks for. So what I'm saying is it can look. If they had turned it around, could they have seen the. No, Your Honor. They can see it in all directions. There's multiple monitors. It's not just that they can see the valley. Plus, they would look, and when they look at the valley, they look at the valley when someone has already made it by the line of defense. That's when they look at the Tijuana River Valley. What they're doing is looking north, including that hill where Mr. Mario Betancourt was. That's where they're looking until they get a call on their radio to look for people who've made it into the general population, which is the question I was getting into, is that he hadn't made it into the Tijuana River Valley where he would have been free to mix with the general population. And as far as the government's argument, finally, that official restraint requires constant surveillance, taken to its ultimate extreme, that would mean if an officer blinks that you're not under official restraint. And this court's decision in Pacheco Medina, where he lost sight of him for a split second, where he rounded the corner, shows that. That's not the question here. The question is, were they watching him before the censure went off? Right. And in Zavala Mendez, there was an observation. And there the Ninth Circuit found that because there was control, as long as there's control and he's within the clutches of the government, then he's not free to leave. And the language about being free to mix with the population is from 1908, and it's consistent through all the cases. What the government is doing is trying to limit free to mix with the population to constant surveillance. And the cases say that official restraint should be viewed broadly, not narrowly, and the government tries to limit it only to constant surveillance, and that's not the law. It shouldn't be limited just to constant surveillance. Thank you. The case just argued will be submitted. The next case for oral argument is United States v. Castillo-Bassa. Good morning, honors.
judges: Reinhardt, Trott, Wardlaw